GHRIST v CHRYSLER CORPORATION

Docket No. 98862. Argued December 5, 1995 (Calendar No. 2). Decided
    May 1, 1996.

    Gordon Ghrist brought a products liability action in the Macomb Cir-
        cuit Court against Chrysler Corporation and Jeep Eagle Corpora-
        tion, manufacturers of a die used by his employer, Aetna Enter-
        prises, alleging liability as a result of defective design and manufac-
        ture for injuries he suffered when using the die. The court,
        Robert J. Chrzanowski, J., granted summary disposition for the
        defendants, finding that absent evidence that a die manufacturer
        knows or has specific reason to know that the original purchaser
        will use a die unsafely, it has no duty to provide safety devices not
        ordered by the purchaser. The Court of Appeals, CORRIGAN, P.J., and
        R. J. COLOMBO, JR., J. (NEFF, J., concurring in the result only),
        affirmed in an unpublished opinion per curiam, relying on *Freder-
        icks v General Motors Corp*, 411 Mich 712 (1981), and *White v
        Chrysler Corp*, 421 Mich 192 (1984) (Docket No. 143681). The
        plaintiff appeals.

        In an opinion by Justice LEVIN, joined by Chief Justice BRICKLEY,
    and Justices CAVANAGH, BOYLE, and MALLETT, the Supreme Court *held*:

        The Court of Appeals erred in affirming the circuit court's grant
    of summary disposition for Chrysler/Jeep Eagle. The plaintiff made
    out a facially valid claim on which relief can be granted. Whether
    the die that caused the injury was defectively designed is a ques-
    tion of fact.

        1. The law of products liability imposes greater responsibility on
    one who manufactures and designs a chattel than on one who
    merely supplies it. The manufacturer is especially knowledgeable
    about a product's capabilities and limitations and the foreseeability
    of harm, and is in the best position to effectuate needed safety-
    related improvements. Because the manufacturer possesses both
    this knowledge and power, it is uniquely susceptible to the incen-
    tive structure built into the negligence standard and as a result is
    more likely to actually implement needed changes. By putting the
    product into the stream of commerce, the manufacturer impliedly
    promises that the product is safe for its intended and all reasonably
    foreseeable uses.

2. A manufacturer has a duty to design its product to eliminate any unreasonable risk of foreseeable injury. While a die, standing alone, is an inert object only capable of causing injury when teamed with a working press, this in itself does not insulate die manufacturers from liability under all circumstances. Like any other product manufacturer, a manufacturer of a die is liable for negligence in the manufacture or sale of any product that may reasonably be expected to be capable of substantial harm if it is defective, and is similarly liable under a breach of warranty theory if it supplies a defective product that causes injury.

3. A product is defective if it is not reasonably safe for its foreseeable uses. The definition of "defective" is not limited to manufacturing defects, but also includes design defects. In this case, the plaintiff alleged that the defendants' inclusion of a T-shaped kicker on its die created hazardous pinch points, thereby rendering the die defective, that his injuries were caused by this defect, and that they were foreseeable, given the relationship between the claimed defect and the ordinary use of the press. Thus, the plaintiff has stated a claim on which relief can be granted.

4. Although an employer has a statutorily imposed duty to make the workplace safe for its employees, the Michigan Occupational Safety and Health Act does not abrogate the general duty of a manufacturer to exercise the degree of care necessary in the design and manufacture of a product to avoid all reasonably foreseeable injuries. The public interest in assuring that safety devices are installed demands more from the manufacturer than to leave such a critical phase of the manufacturing process to the haphazard conduct of the ultimate purchaser. The mandates of the MIOSHA do not invalidate a common-law cause of action that otherwise would be maintainable.

Reversed and remanded for trial.

Justice RILEY, joined by Justice WEAVER, dissenting, stated that summary disposition was properly granted in this case. The defendant provided a die that was to be used in a larger press system. Standing alone, the die could not cause any injury, and there is no guarantee that the absence of a T-bar on the die would prevent all injuries once incorporated in the press. In order for the risk of injury to arise, it had to be included in a press system. Under MCL 408.1011(a); MSA 17.50(11)(a), it is the responsibility of the employer utilizing this press system to make sure that the system as a whole is safe for its employees.

*Chambers, Steiner* (by *Angela J. Nicita*) for the plaintiff.

*Feikens, Vander Male, Stevens, Bellamy & Gilchrist, P.C.* (by *Roger L. Wolcott*), for the defendants.

Amicus Curiae:

*Mark Granzotto* and *Richard E. Shaw* for Michigan Trial Lawyers Association.

LEVIN, J. The question presented is whether the manufacturer of a die is subject to liability for injuries resulting from the defective design and manufacture of the die.

The circuit court concluded that, except under limited circumstances, the manufacturer of a die is not subject to liability for product defects and granted Chrysler Corporation's and Jeep Eagle Corporation's motion for summary disposition.

The Court of Appeals, relying on *Fredericks v General Motors Corp*, 411 Mich 712; 311 NW2d 725 (1981), and *White v Chrysler Corp*, 421 Mich 192; 364 NW2d 619 (1984), affirmed. We reverse and remand for trial.

I

Plaintiff Gordon Ghrist was working as an employee of Aetna Enterprises on May 1, 1989, when his right hand became caught in a die. The die, which Ghrist alleges was designed and manufactured by Chrysler/Jeep Eagle, was fitted by Chrysler/Jeep Eagle with T-shaped "kickers" designed to help eject parts made in the die. Ghrist asserts that the injury occurred when he reached into the press area to remove a part, and the kicker descended unexpect-

edly. The effect was to pinch his right hand and thereby cause injury.[1]

Ghrist filed this action, alleging that Chrysler/Jeep Eagle had negligently designed and manufactured the die, negligently failed to test the die, and breached express and implied warranties.

The complaint alleges that the "kickers" on the die created dangerous pinch points even when used properly.[2] The complaint further alleged that the T-shaped nature of the kickers was not essential to the die's function and that the die could have been designed with safer kickers without any corresponding decrease in utility. In granting summary disposition, the judge said that "[a]bsent evidence that a die press manufacturer knows or has specific reason to know that the original purchaser will use a die press unsafely, it has no duty to provide safety devices not ordered by the purchaser . . . ."

The Court of Appeals affirmed in an unpublished per curiam opinion on January 26, 1994.[3] Agreeing with the circuit judge, the Court of Appeals said that "[i]t is implicit under *Fredericks* and *White* that there is no cause of action for negligent design and manufacture of a die."[4]

---

[1] As a result of this injury, Ghrist's right index finger had to be amputated.

[2] The purpose of a kicker is to lift the part off the press after it has been stamped. After this has occurred, the kicker is supposed to retract into the die. Because a T-shaped kicker contains a horizontal cross member, a pinch point is created when the kicker retracts into the die at the top of the T.

[3] The Court of Appeals held that summary disposition was more properly granted under MCR 2.116(C)(8), than 2.116(C)(10), but found the error to be harmless.

[4] Docket No. 143681, p 2.

II

In *Fredericks* and *White*, this Court considered whether an employee who was injured while working with a die that had been installed in an unguarded press, could maintain an action against the owner of the die who had purchased the die from the manufacturer and had loaned it to the plaintiff's employer.

The plaintiffs in both cases asserted that the dies should have been guarded, and sought to recover under two legal theories. One was negligent entrustment. In *Fredericks*, recovery also was sought on the ground that an unguarded die is so unreasonably dangerous as to be defective for purposes of a products liability action. Similarly, the plaintiffs in *White* sought recovery on the ground that defendants Chrysler and Ford had "negligently supplied [the plaintiff's employer] with chattels (the die sets) dangerous for the intended use."[5]

This Court denied recovery in both cases on both claims. With respect to the claim that the die was defective as delivered by General Motors, this Court in *Fredericks* said that in light of each employer's statutorily mandated duty to maintain safe working conditions, it could not "hold *as a matter of law* that it was foreseeable to defendant that the product it supplied would be used in an unsafe manner rendering it defective."[6] (Emphasis added.) The plaintiffs' negligent supply claim was also rejected in *White* on similar grounds.

In contrast with *Fredericks* and *White*, where the defendants loaned the die to plaintiffs' employer,

---

[5] 421 Mich 197.
[6] 411 Mich 720-721.

Ghrist alleges that Chrysler/Jeep Eagle was the manufacturer and designer of the die that caused his injury. Chrysler/Jeep Eagle argues that a distinction between an allegation of negligent design and manufacture and one of negligent supply is not cognizable at law.[7]

## III

The law of products liability imposes greater responsibility on one who manufactures and designs a chattel than on one who merely supplies it. See 2 Restatement Torts, 2d, § 388, p 300;[8] *Bevard v Ajax Mfg Co*, 473 F Supp 35, 38-39 (ED Mich, 1979); *Seasword v Hilti, Inc (After Remand)*, 449 Mich 542, 545-547; 537 NW2d 221 (1995). The manufacturer is especially knowledgeable about a product's capabilities and limitations and the foreseeability of harm. Further, the manufacturer is in the best position to effectuate needed safety-related improvements. Because the manufacturer possesses both this knowl-

---

[7] See *Villar v E W Bliss Co*, 134 Mich App 116; 350 NW2d 920 (1984) (relying on *Fredericks* to resolve the issue of manufacturer liability in favor of the defendant); *Davis v Link, Inc*, 195 Mich App 70; 489 NW2d 103 (1992).

[8] The Restatement provides at 300:

There are other rules [of law] which impose upon the suppliers of chattels additional duties because of the purpose for which or the manner in which the chattels are supplied or *because the chattel has been made by them or put out as their product.* [Emphasis added.]

One of these "other rules" is set forth in § 398, p 336:

A manufacturer of a chattel made under a plan or design which makes it dangerous for the uses for which it is manufactured is subject to liability to others whom he should expect to use the chattel or to be endangered by its probable use for physical harm caused by his failure to exercise reasonable care in the adoption of a safe plan or design.

edge and power, it is uniquely susceptible to the incentive structure built into the negligence standard and, as a result, is more likely to actually implement needed changes.[9] Moreover, by putting the product into the stream of commerce, the manufacturer impliedly promises that the product is safe for its intended and all reasonably foreseeable uses.

A manufacturer has a duty to design its product to eliminate "any unreasonable risk of foreseeable injury." *Prentis v Yale Mfg Co*, 421 Mich 670, 693; 365 NW2d 176 (1984). While this Court accepts that a die, standing alone, is an inert object only capable of causing injury when teamed with a working press, this in itself does not insulate die manufacturers from liability under all circumstances.[10]

Like any other product manufacturer, a manufacturer of a die "is liable for negligence in the manufacture or sale of any product which may reasonably be expected to be capable of substantial harm if it is defective." Prosser & Keeton, Torts (5th ed), § 96, p 683; *Prentis, supra* at 691.[11] A die manufacturer is similarly liable under a breach of warranty theory if it supplies a defective product that causes injury. *Piercefield v Remington Arms Co*, 375 Mich 85, 96;

---

[9] As the Court of Appeals noted in *Seasword, supra* at 613-614, "a primary purpose of products liability law [is] to encourage the design of safer products and thereby reduce the incidence of injuries." See also *Prentis v Yale Mfg Co*, 421 Mich 670, 689-690; 365 NW2d 176 (1984); Wade, *On product "design defects" and their actionability*, 33 Vand L R 551, 569 (1980).

[10] The Court of Appeals said that "where there is evidence presented of the manufacturer's knowledge of unsafe use, or that unsafe use is foreseeable, liability is not precluded." *Shipman v Fontaine Truck Equipment Co*, 184 Mich App 706, 713; 459 NW2d 30 (1990).

[11] See also *Elsasser v American Motors Corp*, 81 Mich App 379, 384; 265 NW2d 339 (1978).

133 NW2d 129 (1965); *Smith v E R Squibb & Sons*, 405 Mich 79, 89; 273 NW2d 476 (1979).[12]

IV

Ghrist's breach of warranty and negligence claims thus turn on whether the die was defective. "A product is defective if it is not reasonably safe for its foreseeable uses." *Fredericks, supra* at 720. This definition of "defective" is not limited to manufacturing defects, but also includes design defects. *Prentis, supra* at 683-684; *Scott v Allen Bradley Co*, 139 Mich App 665, 670; 362 NW2d 734 (1984); *Johnson v Chrysler Corp*, 74 Mich App 532, 537; 254 NW2d 569 (1977).

We are obliged, for purposes of this motion for summary disposition, to accept the facts as pleaded by Ghrist as true.[13]

Ghrist alleges that Chrysler/Jeep Eagle's inclusion of the T-shaped kicker on its die created hazardous pinch points, thereby rendering the die defective.[14] He

---

[12] See also *Johnson v Chrysler Corp*, 74 Mich App 532, 537; 254 NW2d 569 (1977).

[13] *Wade v Dep't of Corrections*, 439 Mich 158, 162-163; 483 NW2d 26 (1992).

It is not the province of this Court to resolve issues of fact. This is no less true where the inquiry is whether the product suffers from a design defect. That task is within the province of the jury. *Gregory v Cincinnati Inc*, 450 Mich 1, 6; 538 NW2d 325 (1995); *Detroit & Milwaukee R Co v Van Steinburg*, 17 Mich 99, 120-121 (1868).

[14] Ghrist and Chrysler/Jeep Eagle are not in agreement concerning the nature of Ghrist's allegations. Ghrist contends that he asserted that the die is defective in itself because it uses horizontal kickers. Chrysler/Jeep Eagle contends that this is just artful complaint drafting and that Ghrist's allegations are nothing more than the failure-to-guard issue raised in *Fredericks* and *White*.

We do not accept either interpretation of the complaint as definitive, but merely conclude that any issue in this regard need not be reached at this time.

also contends that his injuries were caused by this defect and were foreseeable, given the relationship between the claimed defect and the ordinary use of the press. Ghrist thereby stated a claim on which relief can be granted.[15]

V

Chrysler/Jeep Eagle asserts that summary disposition was proper because it was not legally possible to foresee that the die would be used by Ghrist's employer in an unsafe manner because Ghrist's employer was required, under the Michigan Occupational Safety and Health Act, to "[f]urnish to each employee, employment and a place of employment which is free from recognized hazards that are causing, or are likely to cause, death or serious physical harm to the employee."[16] Although an employer has a statutorily imposed duty to make the workplace safe for its employees, MIOSHA does not abrogate the general duty of a manufacturer to exercise the degree of care necessary in the design and manufacture of a product to avoid all reasonably foreseeable injuries. "The public interest in assuring that safety devices are installed demands more from the manufacturer than to permit him to leave such a critical phase of his manufacturing process to the haphazard conduct of the ultimate purchaser." *Bexiga v Havir Mfg Corp*, 60 NJ 402, 410; 290 A2d 281 (1972).

Were this Court to hold otherwise, manufacturers would be free to rely on MIOSHA as a shield and to

---

[15] We note that, in contrast to this case, when this Court addressed the issues raised in *Fredericks* and *White*, a trial on the merits had already been held and a full evidentiary record had been developed.

[16] MCL 408.1011; MSA 17.50(11).

manufacture products girded with only the bare mini-
mum of safety features. Responsibility for safety
would shift from the party most able to provide it in
the least expensive and highest quality form and
would rest solely on the shoulders of the compara-
tively ignorant party, the employer. Such a scenario
harkens back to the pre-*MacPherson v Buick Motor
Co*[17] period when caveat emptor ruled the day and all
risk of liability was transferred along with the goods
being purchased.

Chrysler/Jeep Eagle's position also runs contrary to
the clearly expressed intent of the Legislature in
enacting MIOSHA, which provides:

> *Nothing in this act shall be construed to* supersede or in
> any manner affect any workers' compensation law, or to
> enlarge or *diminish or affect* in any other manner *the com-
> mon law* or statutory *rights*, duties, or liabilities *of employ-
> ers* and *employees* under any law with respect to injuries,
> diseases, or death of employees arising out of, or in the
> course of, employment. [MCL 408.1002(2); MSA 17.50(2)(2)
> (emphasis added).]

The foregoing provision illustrates that, policy consid-
erations aside, the mandates of MIOSHA do not invali-
date a common-law cause of action against a third
party that would otherwise be maintainable without
regard to the employer's obligations to the
employee.[18]

---

[17] 217 NY 382; 111 NE 1050 (1916).

[18] Chrysler/Jeep Eagle also urges this Court to dismiss Ghrist's com-
plaint on the ground that his case has now become moot. Chrysler/Jeep
Eagle contends that dismissal is warranted because Ghrist recently
entered into a settlement agreement with Auto-Die, Inc. This agreement,
asserts Chrysler/Jeep Eagle, evidences that Auto-Die was in fact the man-

VI

We hold that the Court of Appeals erred in affirming the circuit court's grant of Chrysler/Jeep Eagle's motion for summary disposition. Ghrist made out a facially valid claim on which relief can be granted. Whether the die that caused Ghrist's injury was defectively designed is a question of fact for the jury to decide.

Reversed and remanded for trial.

BRICKLEY, C.J., and CAVANAGH, BOYLE, and MALLETT, JJ., concurred with LEVIN, J.

RILEY, J. (*dissenting*).

I

We are called upon to decide whether the trial court properly granted defendant's motion for summary disposition. The majority found the answer to this question to be no. I respectfully dissent.

II

The majority argues that summary disposition was improperly granted.

> We hold that the Court of Appeals erred in affirming the circuit court's grant of Chrysler/Jeep Eagle's motion for summary disposition. Ghrist made out a facially valid claim on which relief can be granted. Whether the die that caused Ghrist's injury was defectively designed is a question of fact for the jury to decide. [*Ante* at 252.]

ufacturer of the die, and, as a result, Chrysler/Jeep Eagle cannot be held liable for Ghrist's injuries.

While Chrysler/Jeep Eagle appears correct in noting that a settlement was reached, the agreement's implications should be considered by the trial court on remand.

I disagree. The Court of Appeals concluded that summary disposition was proper, citing *Fredericks v General Motors Corp*, 411 Mich 712; 311 NW2d 725 (1981), and *White v Chrysler Corp*, 421 Mich 192; 364 NW2d 619 (1984), for support.

> Under the holdings of *Fredericks* and *White*, there is no duty for an automobile manufacturer to place guards on a die or to warn the component manufacturer of hazards attendant with its use. *Fredericks* held that there is no cause of action for negligence or for breach of implied warranty for an unguarded die. Likewise, *White* determined that negligently supplying an unguarded die failed to state a claim.
>
> It is implicit under *Fredericks* and *White* that there is no cause of action for negligent design and manufacture of a die. It is not sufficient to allege negligent design and manufacture as opposed to negligent supply. Nor is a claim stated merely by asserting that the die had pinch points rather than that it was unguarded. Regardless of the theory, plaintiff's employer had the duty to provide safe working conditions and the failure to do so was not foreseeable. [Unpublished opinion per curiam, issued January 26, 1994 (Docket No. 143681), slip op at 2.]

In *Fredericks*, the plaintiff suffered nearly the complete loss of his left hand when it was crushed by an unguarded power press. He sued General Motors, who owned the die in the press at the time of the accident, claiming that the die was unreasonably dangerous and defective because it was not guarded.[1]

---

[1]  [P]laintiff contends that an unguarded die is unreasonably dangerous and should, therefore, be considered "defective," giving rise to products liability on the part of the supplier for personal injuries sustained by its use. Plaintiff argues that his injury was a result of the absence of a guard on this particular die, that General Motors could have provided a guard, and that the failure to provide a guard should result in liability. [*Id.* at 720.]

This Court found that the directed verdict was properly granted.

> A product is defective if it is not reasonably safe for its foreseeable uses. An unguarded die may be used in a reasonably safe manner in a guarded press or in an unsafe manner in an unguarded press. At the time of plaintiff's injury 1967 PA 282 required that "[e]ach employer shall establish and maintain conditions of work which are reasonably safe and healthful for employees." In light of this statutory duty imposed on Manistee Drop Forge we cannot hold as a matter of law that it was foreseeable to defendant that the product it supplied would be used in an unsafe manner rendering it defective. [*Id.* at 720-721.]

In both *Fredericks* and the present matter, the die causing the injury was owned by an automotive company and was being used by another corporation for stamping purposes.[2] In both cases, the plaintiffs alleged that these dies contained design defects. In *Fredericks*, the alleged defect was the lack of a safety guard, and here the alleged defect was a T-bar kicker that created a pinch point.

Plaintiff attempts to distinguish *Fredericks* by arguing that, in the present case, a safety device could not have been added to the die in order to make it completely safe. However, *Fredericks* could not state with certainty that a guard on the press would have prevented the injury, only that it might have.

> Plaintiff's injury may well have resulted from the absence of guarding; however, *this accident might have been pre-*

---

[2] This is not an uncommon occurrence. Generally, the automotive companies maintain ownership of these dies so as to guarantee production. If an outsourcing company goes bankrupt or cannot continue to produce the finished product, the automotive companies can simply reacquire the dies and send them to another outsourcing company for production.

> *vented by guarding on the press* instead of the die. There
> are numerous methods of guarding the point of operation
> on a power press. Die guards are merely one. [*Id.* at 720
> (emphasis added).]

Similarly, it cannot be said that removing the T-bar in
this case would insure absolute safety. Even if the
alleged design defects were cured, injuries of the type
suffered by the plaintiff in *Fredericks* and this case
remain a possibility. Hence, *Fredericks* is directly on
point, and the Court of Appeals properly relied on it.

The Court of Appeals also correctly relied on
*White.* In *White,* the plaintiffs were injured when their
hands were caught in power presses.[3] Although the
power presses were owned by the plaintiffs' employ-
ers, they were being utilized to provide component
parts for Ford and Chrysler, who had designed the
dies used for the project. This Court, in a unanimous
decision, found for the defendants.

> We would not be justified in so transforming the respon-
> sibility for the observance of job safety precautions. The
> common law and the Legislature impose responsibility for
> job safety on the contractor, not on the employer of the
> contractor. However, because of the bar of the exclusive
> remedy provision of the workers' compensation act, there
> generally is no tort liability for failure to provide workplace
> safety. The proposed theory of liability would evolve a spe-
> cial rule for the benefit only of employees of a contractor
> injured as a result of the use of chattels in production pur-
> suant to an out-source contract. A common-law cause of
> action should not be evolved solely or primarily to avoid a
> statutory limitation. We are not persuaded that such a spe-
> cial rule for the benefit only of a discrete class of seriously
> injured workers is justified. [*White, supra* at 204.]

---

[3] *White* and *Buschlen v Ford Motor Co, supra.*

Another case that is directly on point and persuasive is *Bradford v General Motors Corp*, 123 Mich App 641; 333 NW2d 109 (1983). In *Bradford*, General Motors sent a die to the plaintiff's place of employment, Wyandotte Tool Company. Unfortunately, while testing this die, the plaintiff was injured when her hand was caught and crushed inside the die.[4] The plaintiff brought suit against General Motors on the ground that the die was defective because it did not contain the proper guards.[5] The Court of Appeals explicitly referenced *Fredericks*:

> *Fredericks* controls this case. When Bradford was injured in 1973, the statute referred to in *Fredericks* was still in effect. . . . GM, then, was justified in expecting Wyandotte to fulfill its statutory duty to provide a safe workplace, including machines properly guarded under OSHA[6] and MIOSHA.[7] Under *Fredericks*, the dies involved here were not unsafe for their foreseeable uses. The plaintiff did not establish a prima facie case that GM knew or should have known of Wyandotte's dangerous work site, which would render the dies unsafe. The granting of a directed verdict was proper. [*Bradford, supra* at 645.]

This decision closely parallels the facts presented here. In both the present case and *Bradford*, the plaintiffs were injured in press accidents. The presses

---

[4] Wyandotte Tool Company does not produce parts for General Motors. Instead, it performs tests on their dies.

> Wyandotte does not produce parts for GM. Instead, GM's dies are only tested at Wyandotte's facility. When new dies are made, GM tests them for quality of the products stamped. [*Id.* at 644.]

[5] According to testimony, the machine was not guarded according to OSHA standards and the dies did not have built-in guards. [*Id.*]

[6] 29 USC 651 *et seq.*

[7] MCL 408.1001 *et seq.*; MSA 17.50(1) *et seq.*

were owned by an outsource company, the dies were provided by an automotive corporation, and both plaintiffs alleged defects in the design of the dies.[8]

### III

The majority argues that the manufacturer of the die was under a duty to make the die safe for its intended use.

A manufacturer has a duty to design its product to elimi-
nate "any unreasonable risk of foreseeable injury." *Prentis v
Yale Mfg Co*, 421 Mich 670, 693; 365 NW2d 176 (1984).
While this Court accepts that a die, standing alone, is an
inert object only capable of causing injury when teamed
with a working press, this in itself does not insulate die

---

[8] Another case that I believe is persuasive is *Villar v E W Bliss Co*, 134 Mich App 116; 350 NW2d 920 (1984). In *Villar*, the plaintiff was injured while operating a press manufactured by the defendant. The press was manufactured in 1930 and did not have sufficient safety guards. However, the specific press was included in a much larger press system. The Court of Appeals found:

Because *Fredericks* shows that it was not foreseeable that plain-
tiff's employer would fail to incorporate the press into a press sys-
tem containing adequate safety devices, the trial court erred by
declining to grant defendant's motion for a directed verdict. [*Id.* at
121.]

The Court arrived at this decision because the press manufactured by the defendant was a component included in a larger press system.

The press manufactured by defendant here, like the dies at issue
in *Fredericks*, was only a part of a press system. The press at issue
here could only be used in conjunction with dies, a power source,
and some method of feeding materials into the press, whether man-
ual, semi-automatic, or automatic. The press was harmless and
inoperable unless incorporated into such a system. [*Id.* at 120.]

If, in *Villar*, an entire press included in a press system did not invoke liability on the manufacturer of the press, then certainly the simple die component included in a much larger press and press system cannot invoke liability either.

manufacturers from liability under all circumstances. [*Ante* at 248.]

I agree that a manufacturer has a duty to design a product safely, but in the present case defendant only provided a die that was to be used in a much greater press system. The die, standing alone, could not cause any injury, and there is no guarantee that the absence of the T-bar on the die would prevent all injuries once incorporated in the press.

In any event, in order for the risk of injury to arise, the die had to be included in a press system. Under MCL 408.1011(a); MSA 17.50(11)(a), it is the responsibility of the employer who is utilizing this press system to make sure that the system as a whole is safe for its employees.

> An employer shall:
> (a) Furnish to each employee, employment and a place of employment which is free from recognized hazards that are causing, or are likely to cause, death or serious physical harm to the employee.

The majority argues that this analysis will encourage manufacturers to rely on MIOSHA as a shield.

> Were this Court to hold otherwise, manufacturers would be free to rely on the MIOSHA as a shield and to manufacture products girded with only the bare minimum of safety features. [*Ante* at 250-251.]

I disagree. *Fredericks, White, Villar v E W Bliss Co*, 134 Mich App 116; 350 NW2d 920 (1984), and *Bradford* do stand for the proposition that the employer is the one who has the onus of guaranteeing that a press system is safe when it utilizes a die. However,

manufacturers are still required to make safe products. If the manufacturer provided a die that was so negligently designed and assembled that it exploded after its first use, then obviously the manufacturer would not be able to hide behind the shield of MIOSHA. Those facts, however, were not the ones presented here.

IV

Although my decision would limit plaintiff's recovery to worker's compensation, I do not believe that this is the wrong result. Moreover, if this result is deemed to be incorrect, it should be left to the Legislature to correct. Thus, I concur with this Court's statement in *White, supra* at 206:

> The absence of tort liability or other reparations for loss not covered by workers' compensation benefits caused by the failure to observe job safety precautions results in the undercompensation of many seriously injured workers. The larger problem of uncompensated loss for industrial injury or disease remains unresolved, and a solution may be impeded, by allowing a finite number of seriously injured workers to recover for loss not covered by workers' compensation benefits. This social problem deserves a broader solution than patchwork by this Court.

V

Defendant merely provided a die to be used by Aetna Industries in its larger press system. It was Aetna's responsibility under MIOSHA to make sure that this press system, as a whole, was safe for the use of its employees.

While Aetna may have failed in this duty, Aetna's negligence is not the issue before this Court. Instead, plaintiff's action is against defendant on the ground

that it supplied an allegedly defective die. The type of fact pattern in the matter before us is directly akin to the facts presented in *Fredericks, White, Bradford,* and *Villar.* Although plaintiff attempts to distinguish these cases, I am not persuaded. In these actions, one constant joining thread exists—a plaintiff attempting to hold a die supplier liable on the ground that the die is somehow defective. Whether that defect is the lack of a safety device or the presence of a T-bar, there is still the same allegation—a defect in the design of a die. Consequently, *Fredericks, White, Villar,* and *Bradford* are directly on point with the facts here. I would affirm the Court of Appeals decision finding summary disposition appropriate.

WEAVER, J., concurred with RILEY, J.